**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, 378 North Main Avenue Tucson, AZ 85701, | Case No. 1:24-cv-87 |
| APPALACHIAN VOICES, 589 West King Street Boone, NC 28607, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| GREENBRIER RIVER WATERSHED ASSOCIATION, 120 Washington Street, No. 3 Lewisburg, WV 24901, | |
| KANAWHA FOREST COALITION, P.O. Box 722 Charleston, WV 25323, | |
| SIERRA CLUB, 2101 Webster Street, Suite 1300 Oakland, CA 94612, | |
| and | |
| WEST VIRGINIA HIGHLANDS CONSERVANCY, P.O. Box 306 Charleston, WV 25321, | |
| Plaintiffs, | |
| v. | |
| UNITED STATES FOREST SERVICE, 1400 Independence Avenue, SW Washington, D.C. 20250, | |
| RANDY MOORE, in his official capacity as Chief of the Forest Service, 1400 Independence Avenue, SW Washington, D.C. 20250, | |
| and | |

JASON HATTERSLEY, in his official capacity as
Gauley District Ranger of the Forest Service,
932 Northfork Cherry Road
Richwood, WV 26261,

        Defendants.

## INTRODUCTION

1.      Plaintiffs Center for Biological Diversity, Appalachian Voices, Greenbrier River
Watershed Association, Kanawha Forest Coalition, Sierra Club, and West Virginia Highlands
Conservancy (collectively "Conservation Groups") challenge the failure of Defendants United
States Forest Service ("Forest Service"), Randy Moore, Chief of the Forest Service, and Jason
Hattersley, Gauley District Forest Service Ranger, to comply with the Endangered Species Act
("ESA"), 16 U.S.C. §§ 1531–1544, National Environmental Policy Act ("NEPA"), 42 U.S.C. §§
4321–4370, and Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, when issuing
Road Use Permit FS-7700-41 ("Permit") to allow private mining company South Fork Coal
Company ("Applicant") to use Forest Service roads in the Monongahela National Forest ("NF")
to haul coal and coal mining equipment and supplies within the Cherry River watershed.

2.      The Cherry River watershed is an area with exceptional ecological value and
biodiversity that lies within and adjacent to the Monongahela NF. The Cherry River watershed,
which includes South Fork Cherry River, North Fork Cherry River, Laurel Creek, and Cherry
River, is a stronghold of the endangered candy darter—a vibrant freshwater fish known as the
"underwater rainbow" that is on the knife's edge of extinction. The stream corridors and mixed
conifer and red spruce forests of the Cherry River watershed also provide ideal summer roosting
and foraging habitat for two endangered bats: the northern long-eared bat and the Indiana bat.

3.      In September 2021, the Forest Service issued the Permit authorizing the Applicant to use Forest Service Road 249 ("FS 249") to haul oversized coal loads from Rocky Run Mine—a surface coal mine on adjacent private lands—on a gravel road on the Monongahela NF that is upslope of and runs along South Fork Cherry River; to conduct extensive road grading, clearing, and reconstruction work to make FS 249 usable for daily oversized coal hauling, including constructing ditches and installing culverts on direct tributaries to South Fork Cherry River to prevent sediment from entering the stream; and to use Forest Service Road 223 ("FS 223"), a gravel road that runs along a tributary to North Fork Cherry River, to haul coal-mining equipment and supplies—including fuel and explosives—back and forth to Rocky Run Mine.

4.      These authorized activities are likely to cause lasting harm to the Cherry River watershed and its resident endangered species. Daily heavy coal truck traffic damages gravel roads and, together with the actions required to improve and maintain the haulroad, can cause increased delivery of fine sediments to streams, destroying and forever altering the candy darter's stream habitat and the landscape. Harmful coal dust can escape from open-top coal trucks as they drive, polluting the surrounding air and water with toxic chemicals and heavy metals, including arsenic, selenium, cadmium, and mercury, threatening aquatic life, and contaminating drinking water sources. Coal trucks can also spill large quantities of coal through accidents, presenting a serious risk to the candy darter and the rivers. Road work, vegetation clearing, tree cutting, and heavy truck traffic can also disturb roosting bats and disrupt bat foraging, and the use of herbicides to maintain roadways can lethally contaminate surface and ground waters, harming all species that depend on clean water for survival.

5.      Without the Forest Service's authorization of the Permit, the Applicant would not be able to operate Rocky Run Mine. Surface coal mining operations, such as Rocky Run Mine,

can cause significant environmental damage, including erosion, sedimentation, pollution of ground and surface waters, contamination of soils, loss of habitat, and loss of biodiversity.

6.      Despite the many harms to the endangered species that inhabit the Cherry River watershed from coal hauling, road work, and related activities, the Forest Service did not consult with the U.S. Fish and Wildlife Service ("FWS") to ensure that authorization of the Permit is not likely to jeopardize the species' continued existence or destroy or adversely modify critical habitat, in violation of section 7(a)(2) of the ESA. 16 U.S.C. § 1532(a)(2). By issuing the Permit without completing section 7(a)(2) consultation, the Forest Service has irretrievably committed resources and foreclosed the formulation or implementation of any reasonable and prudent alternative measures, in violation of section 7(d) of the ESA. 16 U.S.C. § 1532(d).

7.      The Forest Service also did not conduct any environmental analysis prior to issuing the Permit, in violation of NEPA. 42 U.S.C. § 4332. The Forest Service's failure to comply with NEPA constitutes agency action unlawfully withheld or unreasonably delayed, in violation of the APA. 5 U.S.C. § 706(1). In addition, the Forest Service failed to follow procedures required by law, 5 U.S.C. § 706(2), and its actions are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the APA. 5 U.S.C. § 706(2)(A).

8.      Accordingly, Conservation Groups respectfully request this Court to declare that Defendants are in violation of the ESA, NEPA, and the APA; vacate and set aside the Forest Service's Permit; order the Forest Service to complete consultation with FWS that complies with section 7 of the ESA; order the Forest Service to complete an environmental review that complies with NEPA and the APA; and enjoin the Forest Service from authorizing the use of Forest Service roads on the Monongahela NF until the agency fully complies with these laws.

## JURISDICTION AND VENUE

9.      This action arises under the laws of the United States, including the ESA, NEPA, and the APA.

10.     Plaintiffs provided notice to Defendants of the violations described herein over 60 days prior to filing this Complaint, by letter dated April 25, 2023, pursuant to the citizen suit provision of the ESA, 16 U.S.C. § 1540(g). Defendants have not taken action to remedy the continuing violations of the ESA by the date of this Complaint's filing.

11.     An actual, justiciable controversy exists between Plaintiffs and Defendants, and the requested relief is therefore proper under 16 U.S.C. 1540(g), 28 U.S.C. §§ 2201-02, and 5 U.S.C. §§ 701-06.

12.     Venue in this court is proper under 28 U.S.C. § 1391 because Defendants Forest Service and Randy Moore, Chief of the Forest Service, reside in this district.

## PARTIES

13.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("Center") is a nonprofit organization dedicated to the protection of imperiled species and their habitats. The Center is based in Tucson, Arizona, with staff and offices throughout the country. The Center has more than 87,000 members throughout the United States and the world, including numerous members who live and recreate in West Virginia. The Center's members include those who have viewed and otherwise appreciated the endangered species that may be adversely affected by the activities authorized by the Permit; who live near these species, habitats, and ecosystems; who recreate in the Monongahela NF and Cherry River watershed and have an interest in the area affected by the Permit; and who intend to visit these areas and enjoy these species, habitats, and ecosystems in the future. Because the Center values endangered, threatened, and critically imperiled species

and their critical habitats, the Center places high priority on protecting and recovering these species across their ranges.

14.    Plaintiff APPALACHIAN VOICES is a North Carolina non-profit 501(c)(3) corporation committed to protecting the land, air, and water of the central and southern Appalachian region. The organization's staff and members have long focused on reducing the negative impacts of coal mining on the environment within the region, including impacts to species listed under the ESA. Appalachian Voices has more than 1,000 members, the majority of whom live in the Appalachian states of Virginia, West Virginia, and North Carolina. It maintains two permanent offices in Virginia and one in North Carolina and has remote staff living and working in both West Virginia and Tennessee. Its staff and volunteers routinely conduct water quality monitoring across the central Appalachian coalfield region, including within the Cherry River watershed. Among the organization's members are West Virginia residents who have enjoyed fishing, boating, and hiking in the Cherry River and downstream watersheds, and who hope to return and continue enjoying these activities into the future.

15.    Plaintiff GREENBRIER RIVER WATERSHED ASSOCIATION is a non-profit organization based in Lewisburg, West Virginia, with a mission to promote the preservation, protection, and restoration of the ecological integrity of the Greenbrier River and its watershed. The Greenbrier River Watershed Association accomplishes its mission through education, involvement in special projects, and monitoring of potentially threatening human and environmental health issues.

16.    Plaintiff KANAWHA FOREST COALITION is a local community organization based in Charleston, West Virginia, that works to protect the mountains, streams, and

communities of Appalachia from the devastating impacts of strip mining and mountaintop removal coal mining.

17.    Plaintiff SIERRA CLUB is a nonprofit corporation incorporated in California, with more than 683,000 members and supporters nationwide, including approximately 2,240 members who reside in West Virginia and belong to its West Virginia Chapter. Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club's concerns encompass the exploration, enjoyment, and protection of forests and surface waters in West Virginia.

18.    Plaintiff WEST VIRGINIA HIGHLANDS CONSERVANCY is a nonprofit organization that has been incorporated in West Virginia since 1967. Its volunteer board of directors and approximately 1,500 members work for the conservation and wise management of West Virginia's natural resources. As one of West Virginia's oldest environmental activist organizations, the West Virginia Highlands Conservancy is dedicated to protecting clean air, clean water, forests, streams, mountains and the health and welfare of the people that live in the Mountain State and those who visit to recreate.

19.    Plaintiffs bring this action on behalf of their adversely affected members.

20.    Plaintiffs' members have recreated in, visited, studied, and worked to protect the Cherry River watershed and surrounding environment, which is significantly impacted by the Forest Service's authorization of the Permit. The interests of Plaintiffs' members in the health of the environment and ecosystems in this area is diminished and impaired by the Forest Service's failure to comply with environmental laws when it issued the Permit.

21.    Plaintiffs' members have researched, studied, observed, and sought protection for the endangered species and critical habitats that are likely to be adversely affected by the Forest Service's authorization of the Permit. Plaintiffs' members have visited and observed, or sought out, the endangered species that are harmed by the Forest Service's failure to comply with environmental laws, and Plaintiffs' members intend to continue to visit and observe, or attempt to visit and observe, these species in the near future. Plaintiffs' members derive scientific, recreational, conservation, and aesthetic benefits from these species' existence in the wild, and their interest in maintaining the species inhabiting the rivers and forests of areas affected by coal hauling and mining is entirely dependent on the continued existence of healthy, sustainable, and accessible ecosystems, habitats, and populations. Any action that destroys, degrades, or diminishes these areas, or that kills, injures, harms, harasses, or displaces populations of listed species interferes with Plaintiffs' members' use and enjoyment of the areas and species.

22.    For instance, Tierra Curry is a member and a senior scientist at the Center who lives in eastern Kentucky. She petitioned the FWS to protect the candy darter under the ESA in 2010. Ms. Curry enjoys wading and swimming in rivers and creeks in West Virginia and walking on the banks to look for fish, salamanders, and mussels. Ms. Curry visited North Fork Cherry River, South Fork Cherry River, Cranberry River, and Williams River in the summers of 2021 and 2022 to enjoy the scenery and to look for wildlife, and she plans to return to these areas in the summer of 2024. Ms. Curry's enjoyment of these waterways is diminished by pollution from sediment which smothers the habitats of the animals she loves, including the candy darter.

23.    In addition, Appalachian Voices' member and Central Appalachian Field Coordinator Willie Dodson has worked for years to protect ESA-listed fish and has conducted stream water monitoring in candy darter critical habitat to monitor for pollutants that may be

harmful to the species and to attempt to observe the candy darter. Specifically, Mr. Dodson has conducted water quality monitoring in South Fork Cherry River of West Virginia, in designated critical habitat for the candy darter, and plans to return to the area in the coming months to continue this water quality monitoring and to look for candy darters. FS 249 runs along South Fork Cherry River, Rocky Run Mine drains directly into South Fork Cherry River, and Mr. Dodson's interests in protecting and viewing candy darters and their habitat in South Fork Cherry River are thus threatened by sedimentation and pollution from the activities the Forest Service authorized under the Permit, from Rocky Run Mine, and from Defendants' failures to comply with the ESA, NEPA and the APA when the agency issued the Permit. Mr. Dodson plans to periodically return to the Cherry River watershed and South Fork Cherry River to conduct further water quality testing and to attempt to observe candy darters on an ongoing basis.

24.    In addition, Doug Wood is a retired aquatic ecologist who lives near Charleston, West Virginia, and is a member of the Center, West Virgina Highlands Conservancy, and Kanawha Forest Coalition. Mr. Wood majored in wildlife management in college and worked for many years in water resource management in West Virginia before he retired. Mr. Wood is keenly interested in bats—specifically the endangered northern long-eared bat and Indiana bat— and he has participated in numerous mist net surveys for these bats in West Virginia in an effort to protect bat maternity colonies in the summer from harmful effects of mining, roads, logging, and other activities that can disturb and cause harm to bats. Mr. Wood helped with a bat mist net survey in April 2015 in the Kanawha State Forest, during which his team caught a northern long-eared bat in the mist net. Mr. Wood is aware that many northern long-eared bats have maternity colonies and hibernacula in West Virginia and that Indiana bats use the forests in West Virginia to form maternity colonies and forage in the summer, and he is concerned that disturbance to

their roosting and foraging habitat in the forests and stream corridors of the Cherry River watershed could harm the bats and cause them to disappear from the area forever. Mr. Wood intends to return to the Cherry River watershed in the summer of 2024 to look for bats and fish on South Fork Cherry River, North Fork Cherry River, and Cranberry River. The Forest Service's failure to follow the ESA and NEPA procedures that would protect candy darters, northern long-eared bats, and Indiana bats and their habitats in the Cherry River watershed detract from and diminish his ability to enjoy the area.

25.    Activities that the Forest Service authorized under the Permit directly and irreparably injure Plaintiffs' members' interests. The Forest Service's failure to comply with the ESA and NEPA when it authorized the Permit avoids and undermines protections that are necessary to protect Plaintiffs' members' interests in the existence of the candy darter and its critical habitat, the northern long-eared bat, and the Indiana bat.

26.    Plaintiffs' members' injuries are a result of Defendants' failure to follow the procedures mandated by the ESA and NEPA, which include analysis of the impacts of its action on the environment and listed species, when it issued the Permit. These procedural violations injure Plaintiffs' members' substantive conservation, recreational, scientific, and aesthetic interests. Plaintiffs' members rely on Defendants to comply with the requirements of the ESA and NEPA and to prepare adequate environmental analyses as required by these statutes. Plaintiffs rely on these analyses to monitor the impacts of coal hauling, roads, and mining on listed species; monitor legal compliance concerning species' management; educate members, directors, staff, and the public about species management and the state of the environment; and advocate for policies that protect wildlife and habitat. Defendants' actions and failures to act harm and threaten future harm to the concrete interests that Plaintiffs' members have in the fish,

wildlife, and ecosystems that reside in and depend on the Cherry River watershed and Monongahela NF.

27.     The interests of Plaintiffs' members are directly and irreparably injured by Defendants' violations of law as described in this Complaint. Unless this Court grants the requested relief and orders Defendants to comply with the ESA, NEPA, and the APA, harm to protected species and their habitats will continue to accrue, and Plaintiffs' members' aesthetic, recreational, educational, professional, scientific, spiritual, and conservation interests will continue to be adversely affected. These are actual, concrete injuries to Plaintiffs, caused by the Forest Service's failure to comply with the ESA, NEPA, the APA, and the statutes' implementing regulations. The relief requested will directly redress Plaintiffs' injuries.

28.     Defendant UNITED STATES FOREST SERVICE is a federal agency within the U.S. Department of Agriculture. The Forest Service is responsible for the management of National Forests, including the Monongahela NF. Among its management responsibilities, the Forest Service must ensure that the activities it authorizes, including activities in the Monongahela NF, comply with governing federal environmental statutes, including the ESA and NEPA. The Forest Service issued the Permit challenged in this case.

29.     Defendant RANDY MOORE, Chief of the Forest Service, is sued in his official capacity. The Chief of the Forest Service has the authority under 36 C.F.R. § 212.6 to grant private parties access to lands administered by the Forest Service and intermingled and adjacent private and public lands for the use and development of resources within or adjacent to National Forest lands.

30.     Defendant JASON HATTERSLEY is the Gauley District Ranger of the Forest Service and is sued in his official capacity. The Gauley District Ranger signed the Permit at

issue, authorizing the Applicant to use and conduct extensive maintenance and construction work on Forest Service roads on the Monongahela NF to haul coal, mining supplies, and equipment.

## STATUTORY AND REGULATORY BACKGROUND

### I.    Endangered Species Act

31.    The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). In enacting the ESA "Congress intended endangered species to be afforded the highest of priorities." *Id.* at 174.

32.    The ESA "provide[s] a program for the conservation of … endangered species and threatened species" and "a means whereby the ecosystems upon which [such] species depend may be conserved." 16 U.S.C. § 1531(b).

33.    Consistent with this purpose, the ESA proclaims that it is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act." 16 U.S.C. § 1531(c)(1).

34.    The ESA assigns responsibility to implement the ESA to the Secretaries of the Departments of Commerce and the Interior, who in turn have delegated responsibility to the National Marine Fisheries Service ("NMFS") and FWS, respectively. 50 C.F.R. § 402.01(b).

35.    The ESA defines "conservation" as "the use of all methods and procedures, which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to [the ESA] are no longer necessary." 16 U.S.C. § 1532(3). To those ends, section 7 of the ESA requires all federal agencies to work to recover listed species and contains procedural and substantive requirements to do so.

36.    Substantively, section 7(a)(2) of the ESA requires federal agencies to ensure that "any action authorized, funded, or carried out" is not "likely to jeopardize the continued existence" of any endangered or threatened species or "result in the destruction or adverse modification" of critical habitat. 16 U.S.C. § 1536(a)(2). To "jeopardize" means "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. "Destruction or adverse modification" means "a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." *Id.*

37.    To carry out section 7(a)(2)'s substantive mandate, regulations implementing section 7 of the ESA's consultation process set forth mandatory procedures requiring any federal agency proposing an action (*i.e.*, the "action agency") to consult with an expert agency—FWS for terrestrial and freshwater species or NMFS for marine species and anadromous fish—to determine whether the action is likely to jeopardize any listed species or destroy or adversely modify critical habitat and, if so, to identify ways to modify the action to avoid that result. 50 C.F.R. §§ 402.10–402.17

38.    The regulations require a federal agency to initiate consultation with FWS and/or NMFS whenever the agency undertakes an "action" that "may affect" a listed species or critical habitat. 50 C.F.R. § 402.14(a).

39.    The threshold for a "may affect" determination and the required section 7 consultation is low. *See* 51 Fed. Reg. 19926, 19949 (June 3, 1986) ("Any possible effect, whether beneficial, benign, adverse or of an undetermined character, triggers the formal consultation requirement"); *see also* U.S. Fish & Wildlife Serv. & Nat'l Marine Fisheries Serv.,

Endangered Species Consultation Handbook, at xvi (1998) (defining "may affect" as "the appropriate conclusion when a proposed action may pose *any* effects on listed species or designated critical habitat."). An agency may be relieved of the obligation to consult only if the action will have "no effect" on listed species or critical habitat.

40.    ESA regulations broadly define the scope of agency "actions" requiring section 7 consultation to include "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," including "granting … easements, rights-of-way, [and] permits," and any "actions directly or indirectly causing modifications to the land, water, or air." 50 C.F.R. § 402.02.

41.    An agency satisfies its substantive duties under section 7 of the ESA only by satisfying the consultation requirements set forth in section 7 of the ESA, 16 U.S.C. § 1536, and the implementing regulations, 50 C.F.R. §§ 402.10–402.16, and only after the agency lawfully complies with these requirements may an action that "may affect" a protected species go forward, *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1055-57 (9th Cir. 1994).

42.    A federal agency must review its actions at "the earliest possible time" to determine whether an action "may affect" listed species or critical habitat in the "action area." 50 C.F.R. § 402.14(a).

43.    In section 7 consultation, the action agency must first determine, including by asking FWS and/or NMFS (collectively, the "Services"), whether any ESA-listed or proposed-to-be-listed species may be present in the action area. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12. The "action area" includes "all areas to be affected directly or indirectly by the Federal action and not merely the immediate area involved in the action." 50 C.F.R. § 402.02.

44.    If the action agency finds that listed species may be present in the action area, the action agency must prepare a "biological assessment" to determine whether the proposed action is likely to adversely affect the listed species. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12.

45.    The biological assessment must include, among other things, "[a]n analysis of the effects of the action on the species and habitat, including consideration of cumulative effects, and the results of any related studies." 50 C.F.R. § 402.12(f)(4).

46.    Effects of the action include "all consequences to listed species or critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action" and that "may occur later in time" or "outside the immediate area involved in the action." *Id.* § 402.02. The action "causes" a consequence if it "would not occur but for the proposed action and it is reasonably certain to occur." *Id.*

47.    Cumulative effects of the action are the "effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." *Id.*

48.    If the action agency determines the action "may effect" but "is not likely to adversely affect" listed species or critical habitat, and the Services concur in writing, the regulations permit less comprehensive "informal consultation" to satisfy section 7 consultation obligations.  *Id.* § 402.14(a), (b).

49.    If the Services do not concur with the action agency's "not likely to adversely affect" determination, or if the action agency determines that the action is "likely to adversely affect" listed species or critical habitat, the action agency must engage in "formal consultation" with the Services, as outlined in 50 C.F.R. § 402.14. *Id.* §§ 402.02, 402.14(a).

50.     Formal consultation is "a process between the Service[s] and the Federal agency that commences with the Federal agency's written request for consultation under section 7(a)(2) of the [ESA] and concludes with the Service[s'] issuance of the biological opinion under section 7(b)(3) of the [ESA]." 50 C.F.R. §§ 402.02, 402.14(c)(1).

51.     In formal consultation, the Services must "evaluate the effects of the action and cumulative effects on listed species and critical habitat," added to the "environmental baseline" and "in light of the status of the species and critical habitat," to determine whether the action is likely to jeopardize listed species or destroy or adversely modify critical habitat. 50 C.F.R. § 402.14(g)(3)-(4). The "environmental baseline" must include the past and present impacts of all federal and nonfederal actions in the action area, including those that have already undergone consultation with the Services under section 7 of the ESA. *Id.* § 402.02.

52.     At the conclusion of formal consultation, the Services must issue a "biological opinion" that "detail[s] how the agency action affects the species," 16 U.S.C. § 1536(b)(3)(A), and sets forth the Services' opinion as to whether the action is "likely to jeopardize" the continued existence of listed species or destroy or adversely modify critical habitat, 50 C.F.R. § 402.14(h)(1)-(3).

53.     The determination of whether the action is likely to jeopardize the continued existence of a listed species or destroy or adversely modify critical habitat must be based solely on "the best scientific and commercial data available," 16 U.S.C. § 1536(a)(2), and the Services must use the best available science to formulate the biological opinion and approve any incidental take. 50 C.F.R. § 402.14(g)(8).

54.     If the Services determine that the action will incidentally "take" a listed species but *is not* likely to jeopardize the species or destroy or adversely modify critical habitat, the

Services must provide an "incidental take statement" ("ITS"). *Id.* § 402.14(g)(7). The ITS must quantify the take allowed for each listed species, specify the impact of the incidental take on the species, set forth any "reasonable and prudent measures" ("RPMs") that are necessary or appropriate to minimize the impact from take, and provide "terms and conditions" that the action agency must comply with to implement the RPMs and avoid jeopardy to the species. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

55.     If the Services determine that the action *is* likely to jeopardize listed species or destroy or adversely modify critical habitat, the biological opinion must offer "reasonable and prudent alternatives" ("RPAs") that would reduce the action's impacts so that the action agency may avoid jeopardizing listed species or destroying or adversely modifying critical habitat. 16 U.S.C. § 1536(b)(3)(A).

56.     It is illegal to engage in any activity that "takes" an endangered species absent valid take coverage under section 7 of the ESA or, in the case of actions with no federal agency involvement, section 10 of the ESA. *Id.* §§ 1538(a)(1)(B), 1536(b)(4), 1539.

57.     The ESA defines "take" broadly to encompass all manner of harm and harassment, including direct injury or mortality and any acts or omissions that disrupt or impair significant behavioral patterns. *Id.* § 1532(19); 50 C.F.R. § 222.102. The term "take" is defined in the "broadest possible manner to include every conceivable way" in which a person could harm or kill wildlife. *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 (1995). The ESA's implementing regulations define "harm" in the context of take as including "significant habitat modification or degradation which actually kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, rearing, migrating, feeding or sheltering." 50 C.F.R. § 222.102.

58.    Persons subject to the prohibition on take include individuals and corporations, as well as "any officer, employee, agent, department, or instrumentality of the Federal Government … [or] any State." 16 U.S.C. § 1532(13).

59.    The ESA requires formal consultation to conclude within 90 days of the date that consultation was initiated unless the Services and the action agency agree to extend the consultation for a specified time period. *Id.* § 1536(b)(1)(A); 50 C.F.R. § 402.14(e).

60.    Federal actions that "may affect" listed species or critical habitat may not proceed unless and until the federal action agency ensures, through completing the section 7 consultation process, that the action is not likely to cause jeopardy to the species or destroy or adversely modify critical habitat. 16 U.S.C. § 1536(a); 50 C.F.R. §§ 402.13, 402.14.

61.    To maintain the status quo until consultation is complete, section 7(d) of the ESA requires that during consultation, action agencies "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any [RPMs or RPAs]" necessary to avoid jeopardizing the species. 16 U.S.C. § 1536(d). This prohibition remains in force during the consultation process and continues until the requirements of section 7(a)(2) are satisfied. 50 C.F.R. § 402.09.

## II.    National Environmental Policy Act

62.    NEPA is the nation's charter for the protection of the environment. Congress enacted NEPA to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

63.    To these ends, NEPA requires all federal agencies to prepare environmental documents that analyze and disclose the reasonably foreseeable effects of their actions and ensure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. *Id.* § 4332(C); 40 C.F.R. § 1500.1.

64.    The Council on Environmental Quality ("CEQ") promulgated NEPA regulations that are binding on all federal agencies, 40 C.F.R. §§ 1500-1508, and are primarily intended to "ensure Federal agencies consider the environmental impacts of their actions in the decision-making process," *Id.* § 1500.1.

65.    The threshold for determining whether NEPA applies is whether there is a proposed federal agency action that is not otherwise exempt or excluded from NEPA. 42 U.S.C. § 4336; 40 C.F.R. § 1501.1.

66.    NEPA requires all federal agencies to prepare an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); 40 C.F.R. § 1500.1. To comply with NEPA's procedures, a federal agency "shall" prepare an EIS for any proposed agency action that has "a reasonably foreseeable significant effect on the quality of the human environment." 42 U.S.C. § 4336(b)(1).

67.    When the effects of a federal agency action are less than significant, or to determine whether the effects are significant and warrant preparation of the more detailed EIS, NEPA requires federal agencies to prepare an environmental assessment ("EA"), which is a "concise public document prepared by a Federal agency to set forth the basis of such agency's finding of no significant impact or determination that an environmental impact statement is necessary." *Id.* § 4336(b)(2); 40 C.F.R. § 1508.1.

68.    NEPA requires the action agency to "succinctly describe the environment of the area(s) to be affected or created by the alternative under consideration." 40 C.F.R. § 1502.15. NEPA regulations also require the action agency to evaluate a reasonable range of alternatives including a "no action" alternative when analyzing environmental impacts of the proposed action. *Id.* § 1502.14.

69.    The action agency must set an appropriate baseline detailing the nature and extent of the environmental resources in the area. *Id.* § 1502.15. "The concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process." CEQ, Considering Cumulative Effects under the National Environmental Policy Act, at 41 (Jan. 1997).

70.    NEPA regulations define the "effects" or "impacts" of an action interchangeably as the reasonably foreseeable "changes to the human environment from the proposed action," including all "effects on natural resources and on the components, structures, and functioning of affected ecosystems," as well as the "aesthetic, historic, cultural, economic, social or health [effects]." 40 C.F.R. § 1508.1(g), (g)(4).

71.    An agency's NEPA analysis must consider the proposed agency action's direct, indirect, and cumulative effects. *Id.* § 1508.1(g). Direct effects are caused by the proposed action and occur at the same time and place. *Id.* § 1508.1(g)(1). Indirect effects are caused by the action and occur later in time or father removed in distance. *Id.* § 1508.1(g)(2). Cumulative effects result when the "incremental effects of the action" are "added to the effects of other past, present, and reasonably foreseeable actions" undertaken by any person or agency and "can result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.1(g)(3).

20

72.    To determine whether the effects of a federal action are significant and warrant preparation of a more detailed EIS, agencies must also consider the effects of connected actions, including actions that "[c]annot or will not proceed unless other actions are taken previously or simultaneously; or are interdependent parts of a larger action and depend on the larger action for their justification." *Id.* § 1501.9(e)(1).

## III.    The Administrative Procedure Act

73.    The APA provides that any person who has suffered legal wrong because of agency action or who is adversely affected or aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review of that agency action. 5 U.S.C. § 702.

74.    Under the APA, a reviewing court "shall compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

75.    The APA specifies that a reviewing court "shall hold unlawful and set aside agency action, findings, and conclusions found to be … without observance of procedure required by law." *Id.* § 706(2)(D).

76.    The APA also specifies that a reviewing court "shall hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

77.    An agency's action is arbitrary and capricious if it relied on factors that Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of the agency's expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## FACTUAL BACKGROUND

### I.    The Cherry River Watershed

78.    The Cherry River watershed is known for its outstanding biodiversity and ecological value. It provides some of the best remaining habitat for many critically imperiled animals that depend on clean water, free-flowing rivers, intact forests, and pristine habitat.

79.    The Cherry River watershed lies within the Upper Gauley River portion of the Kanawha River basin, which eventually feeds into the Mississippi River through the Ohio River.

80.    Portions of the Cherry River watershed are within the Monongahela NF.



*Map showing location of Cherry River Watershed and Monongahela NF in West Virginia.*

81.    The Cherry River's headwaters begin as two separate rivers, North Fork Cherry and South Fork Cherry, each rising in southeastern Pocahontas County, West Virginia, and flowing generally west-northwest across northern Greenbrier County before converging in Nicholas County at the city of Richwood, West Virginia, where they become the Cherry River.

The Cherry River watershed is within the Upper Gauley River basin, and also includes Laurel Creek, Cranberry River, and Williams River.

82.    Forests in the Cherry River watershed consist of mixed hardwood and conifer stands, including the treasured red spruce forest ecosystem that is of high conservation value.

83.    Many species that are listed as endangered or threatened under the ESA reside in the streams and forests within the Cherry River watershed.

## II.    Endangered and Threatened Species in the Cherry River Watershed

### A.    The Endangered Candy Darter

84.    The candy darter (*Etheostoma osburni*) is a small, brightly colored freshwater fish that is often called the "underwater rainbow" due to its vibrant blue-green, red, and orange stripes. The candy darter is incredibly rare and exists in only a handful of streams in the Upper Gauley River basin in Virginia and West Virginia, including South Fork Cherry River, North Fork Cherry River, and Laurel Creek.

85.    Candy darters are habitat specialists. They require cold, clean, and quick streams with complex coarse substrates (gravel, cobble, rocks, and boulders) that provide shelter areas, and exposed patches of pebbles and gravel between shelter rocks where female candy darters lay their eggs when spawning and where the vibrantly colored males perform their specialized egg-sheltering behavior, shown in the image below. Spawning typically occurs between April and June.



*Two views of adult male candy darters sheltering eggs among rocky bottom substrate.*

86.    Historically, the candy darter occurred in 35 populations across the Bluestone, Lower New River, Upper Gauley, Lower Gauley, and Middle New watersheds in the Appalachian Plateaus physiographic province and the Upper New River and Greenbrier watersheds in the Valley and Ridge physiographic province.

87.    The candy darter has been extirpated from nearly half of its historical range, with the total loss of 17 of 35 known populations due to harm to the fish's stream habitat—including from coal mining, logging, roads, and displacement by the introduced variegate darter.

88.    As a result of threats facing the species, and given how few populations remain, FWS listed the candy darter as an endangered species in 2018 and proposed 370 stream miles of critical habitat in West Virginia and Virginia. 83 Fed. Reg. 58747 (Nov. 21, 2018).

89.    FWS issued its final rule designating critical habitat for the candy darter in 2021. 86 Fed. Reg. 17956 (Apr. 7, 2021). Critical habitat Unit 5F is comprised of streams in the Cherry River watershed, including South Fork Cherry River, North Fork Cherry River, Laurel Creek, and Cherry River—all four are considered occupied by the candy darter. 86 Fed. Reg. at 17966.

90.    Sedimentation is one of the primary threats to the candy darter's survival. Sedimentation refers to the process whereby fine soil particles (*e.g.*, sands, silts, clays) are

delivered to streams, harming stream habitats by causing increased turbidity, reduced light penetration, shallower depths, and warmer temperatures and by limiting the interstitial spaces among coarse rocky substrates. Excess sedimentation can cause streams to become "embedded" when sediment settles into the spaces between larger cobbles, gravels, rocks, and boulders, which become surrounded by or buried in sediment. As a result, excess sediment harms the candy darter by damaging its sheltering and breeding habitat and smothering its food sources.

91.     Sedimentation is typically caused by erosion from upland activities, such as agriculture, logging, mining, use and maintenance of unpaved roads, and road construction, as well as activities that directly destabilize stream channels, like constructing culverts, crossings, or other instream structures.

92.     Industrial-scale coal mining, logging, agriculture, and sewage and chemical discharges have caused widespread harm to many streams in West Virginia where the candy darter lives by causing sedimentation and increases in stream temperature and chemical toxicity.

93.     The Cherry River watershed is a stronghold for the species—it is considered the most secure habitat for candy darters based on its high percentage of forest cover (indicating low levels of sedimentation and stream embeddedness), absence of variegate darters, and high degree of connectivity among populations due to the absence of major dams and impoundments.

94.     The candy darter population in the Cherry River includes four subpopulations: South Fork Cherry River, North Fork Cherry River, Laurel Creek, and Cherry River. All four Cherry River subpopulations are critically important for the candy darter's recovery because they are among the most genetically pure remaining populations.

95.     Studies have shown that the approximate peak spawning time for candy darters in South Fork Cherry River is April 21.

**B.**    **The Endangered Northern Long-Eared Bat**

96.    As its name suggests, the northern long-eared bat (*Myotis septentrionalis*) is distinguished by its long ears, as compared to other bats in the *Myotis* genus, which usually have small, mouse-like ears. The northern long-eared bat is medium to dark brown on its back, with dark brown ears and wings, and tawny to pale-brown fur on its underside. The bat is about three inches long with a wingspan of 9 to 10 inches and weighs approximately 5 to 8 grams.

97.    Northern long-eared bats depend on intact forest habitat, unfragmented by roads or large clearings, for roosting and foraging, and they prefer to roost and forage near rivers and stream corridors. The bat's low length-to-width wing ratio allows it to maneuver well in forests, and it is well adapted to coniferous forests of red spruce and pine. In addition to foraging on the wing, northern long-eared bats can detect insects within trees and on branches. Northern long-eared bats typically live in colonies of 30 to 100 bats in cave hibernacula and often utilize mines and culverts for hibernacula and roosting sites. Females produce at most one pup per year.



*Northern Long-Eared Bat. Photo courtesy of U.S. Fish and Wildlife Service.*

98.    In the past two decades, the northern long-eared bat has faced a steep and sudden population crash due to habitat loss and disease. The bat's abundance, number of occupied hibernacula, spatial extent, and summer habitat occupancy across the range are all decreasing.

99.     FWS first listed the northern long-eared bat as threatened in 2015 but recently reclassified the bat as endangered due to significant declines. 88 Fed. Reg. 4908 (Jan. 26, 2023).

100.    The bat's low reproductive output of one pup per year and its high site fidelity make it especially vulnerable to catastrophic events and habitat disturbance.

101.    White-nose syndrome is a primary threat to the bat, and human disturbance is responsible for the spread of white nose syndrome. The disease manifests as a white fungus that colonizes the bat's skin and disrupts its hibernation, resulting in excess activity and energy expenditure during winter months. The infected bats' more frequent arousals during hibernation usually lead to starvation and death. In parts of its range, the northern long-eared bat has declined by 99 percent from pre-white-nose syndrome levels. White nose syndrome has been identified in most West Virginia hibernacula.

102.    West Virginia has one of the largest remaining populations of northern long-eared bats in the United States, and more than 100 known hibernacula remain across the state. Male northern long-eared bats have large foraging home range territories, and in West Virginia the foraging range for an individual male northern long-eared bat averages around 152 acres.

103.    The mixed conifer and red spruce forests of the Cherry River watershed provide ideal foraging habitat conditions, and the forested areas around the stream corridors, the Forest Service roads impacted by the Permit, and Rocky Run mine site contain potential summer foraging and roosting habitat that has been deemed suitable for the northern long-eared bat.

104.    Construction, modification, heavy truck traffic, and use of gravel roads along the Cherry River tributaries and within the adjacent mixed conifer-red spruce forest pose a significant threat to northern long-eared bats and their summer foraging and roosting habitat.

C.    **The Endangered Indiana Bat**

105.    The Indiana bat (*Myotis sodalis*) is a small migratory bat that hibernates colonially in caves and mines in winter, and roosts and forages in forests. Indiana bats have small, mouse like ears that are characteristic of other bats in the *Myotis* genus.

106.    Indiana bats require intact forests for foraging and roosting and are found in forested areas in the eastern half of the United States, including West Virginia. Indiana bat roosting habitat is in forested areas with woody vegetation that is typically less than 30 meters from a stream bank and connected to an associated floodplain forest.

107.    During autumn, when Indiana bats swarm and mate at hibernacula, male bats roost in nearby trees during the day and fly to the cave at night. During September in West Virginia, male Indiana bats roost in trees near ridgetops and often switch roost trees each day.

108.    In winter, Indiana bats hibernate in caves and mines. The 2019 winter census estimated that the population consisted of 537,297 bats occurring within 223 hibernacula in 16 states, including West Virginia.



*Indiana Bat. Photo courtesy of the U.S. Forest Service.*

109.    The Indiana bat was originally listed as a species in danger of extinction under the ESA's predecessor statute, the Endangered Species Preservation Act of 1966, and the bat is currently listed as endangered under the ESA.

110.    Since the Indiana bat was listed, its population has declined by more than half. Threats to the bat include loss of summer roosting and foraging habitat, pesticides and other contaminants, human disturbance, and most recently, white-nose syndrome, which has reduced the population by 19 percent since the disease arrived in North America in 2007. Over the past decade, as significant population declines related to white-nose syndrome have occurred, there has also been a substantial reduction in the distribution and abundance of occupied hibernacula.

111.    Continued declines of the Indiana bat, despite the protection of winter cave hibernacula, suggest that the protection and preservation of summer foraging and roosting habitat is critical to prevent further declines of the species.

112.    The stream corridors and the forested areas around the Forest Service roads impacted by the Permit and Rocky Run Mine contain summer foraging and roosting habitat that has been deemed suitable for the Indiana bat.

III.    **The Forest Service's Issuance of the Road Use Permit**

113.    In June 2021, the Applicant applied to the Monongahela NF for a commercial Forest Service road use permit to haul coal from Rocky Run Mine along FS 249 and to haul coal mining equipment and supplies on FS 223.



*Map of Coal Mining Activities and Haulroad in Cherry River Watershed; Candy Darter Critical Habitat Shown in Bright Green. Available at https://conservation-abra.hub.arcgis.com/pages/south-fork-cherry*

114.    Rocky Run Mine is a surface coal mine located on private lands adjacent to the Monongahela NF that is expected to disturb approximately 1,122 acres of forest lands within the Cherry River watershed and deliver runoff and sediments into "receiving streams" that feed directly into South Fork Cherry River, including Rough Fork, Little Rocky Run, Blizzard Run, and Little Blizzard Run. The Applicant has described the area affected by Rocky Run Mine as "Rough Fork of/and Rocky Run, Little Rocky Run, Little Blizzard Run and Blizzard Run," and "all of South Fork of Cherry River of Cherry River of Gauley River of the Kanawha River watersheds[, which] may be temporarily affected during the surface mining operation, but should settle back to pre-disturbance conditions shortly after completion of mining and reclamation."

115.    FS 249 begins in the Monongahela NF on a slope above the origin of South Fork Cherry River, which flows south-westerly between FS 249 and Rocky Run Mine. FS 249 follows

along and above South Fork Cherry River for 1.24 miles before exiting the Monongahela NF, where it becomes Sugartree Road. On its way to the coal preparation plant in Clearco, West Virginia, Sugartree Road connects with a ridge along and above the headwaters of Laurel Creek.

116.    FS 223, also known as Bear Run Road, runs north from Rocky Run Mine through the Monongahela NF for 3.81 miles along Bear Run (a direct tributary to North Fork Cherry River) and connects to Highland Tree Road, which runs along North Fork Cherry River.

117.    The Permit authorizes the Applicant to use FS 249 for daily hauling of heavy, oversized coal loads—36,000 tons per month—from Rocky Run Mine; to use FS 223 to haul equipment and supplies—including fuel, parts, and explosives—to Rocky Run Mine; and to close FS 249 to the public for the Permit's duration.

118.    The Permit also authorizes and requires the Applicant to conduct extensive road work and maintenance on FS 249, including installing pipes and culverts, constructing ditches and in-line sumps, placing straw bales in ditch lines, placing rip rap into receiving streams, grading and resurfacing the roadway, mowing and brushing to clear vegetation from the road prism, and cutting trees around the roadway.

119.    Without the Permit, the Applicant would not be able to haul coal from Rocky Run Mine to the coal preparation plant in Clearco, West Virginia, and would not be able to haul coal mining supplies and equipment to the mine.

120.    The Forest Service issued the Permit on September 29, 2021, and the Permit remains in effect for ten years until September 1, 2031.

## IV.    Harmful Effects of the Forest Service's Authorization of the Permit

121.    The Forest Service's authorization of the Permit is a federal agency action that requires consultation with FWS under section 7 of the ESA and a major federal action for the

purposes of NEPA that is likely to have significant adverse effects on the environment, irreparably alter the landscape, and cause lasting harm to endangered species and their habitats.

122.    The Applicant began road reconstruction work and coal hauling immediately upon receipt of the Permit.

123.    Daily oversized coal hauling and heavy truck traffic damages gravel roads and—together with the road clearing work required under the Permit as necessary to improve and maintain FS 249 as a coal haulroad—are likely to cause pollution, runoff, and sedimentation, and will otherwise harm aquatic and upland forest habitat for the endangered species that reside in the Cherry River watershed.

124.    Maintaining coal haulroads by using herbicides can pollute and contaminate both surface and ground waters, harming imperiled species and all species that depend on clean water for survival.

125.    As open-top coal haul trucks drive, harmful coal dust can escape and pollute the surrounding air and water with toxic chemicals and heavy metals, including arsenic, selenium, cadmium, and mercury, threatening aquatic life and contaminating drinking water sources.

126.    During any accident or collision, coal trucks can also spill large quantities of coal, presenting a serious risk to the candy darter, the rivers, and the surrounding environment.

127.    Road work, vegetation clearing, tree cutting, and heavy coal truck traffic can also disturb bats roosting in trees, disrupt bat foraging along stream and forest corridors, and remove trees and vegetation necessary for roosting and foraging bats.

128.    When crushed rock and aggregate from coal-mining activities is spread onto road surfaces, it can cause lasting contamination and forever alter the chemical composition of water.

129.    Not long after the Forest Service issued the Permit, sedimentation issues arose on FS 249 and FS 233 as a result of actions authorized by the Permit, as well as actions determined to result from Permit violations.

130.    On March 3, 2022, the West Virginia Department of Environmental Protection ("WV DEP") cited the Applicant for failing to properly maintain FS 249, noting "multiple sections of the ditch are full of sediment, most of the sumps are full of sediment, many areas do not have a durable rock surface, and multiple areas are rutted, causing drainage issues."

131.    At a follow-up inspection on March 9, 2022, WV DEP ordered the Applicant to cease all coal hauling because "site conditions [were] worsening," there were "potential off-site impacts … with each precipitation event," and the Applicant had put down non-durable material on the roadway, which was "creating additional problems."

132.    A Forest Service employee inspected the site on March 16, 2022 and found that the Applicant was out of compliance with the Permit on FS 249. The inspection report noted that substantial spring rainfall, coupled with typical freeze-thaw conditions for the area, had caused FS 249 to become muddy and show signs of heavy rutting, and caused sedimentation to fill areas at the ends of culverts. The report noted that the Applicant had used crushed aggregate and "shot rock" from one of its mines in the area, essentially spreading coal waste rock and gravel onto the roadway and using the material to fill areas that drain off the road into South Fork Cherry River. In the inspection report, the Forest Service noted that certain road-fill work on FS 249 was necessary to bring the Applicant back into compliance with the Permit.

133.    The Forest Service's March 16, 2022 inspection report also noted issues observed on FS 223. A culvert at the intersection of FS 223 and State Route 39 ("SR 39") that empties into North Fork Cherry River was crushed due to the Applicant's use of FS 233 in winter and early

spring and the heavy truck traffic that failed to properly turn from SR 39 onto FR 223. The report noted that a series of culverts on FS 233 had failed and overflowed, causing the road surface to wash out and the fill-slope soil to fail and sending sediment off the roadway. The report specified that the repair and maintenance of these culverts should be completed by the Forest Service, not the Applicant, under the Permit.

134.    Forest Service employees performed another site inspection on April 28, 2022, and identified "several areas of concern and potential non-compliance" with the Permit.

135.    At an on-site inspection with the Applicant on May 2, 2022, a Forest Service employee confirmed several Permit violations and additional issues on FS 249, including sedimentation escaping beyond sediment control devices; evidence of pipes in multiple locations starting to misshape and crush under the existing load stresses; evidence of base failures, rutting, and improper shaping of the roadway; failure to clear the roadway of mud and erodible material; and failure to properly remove brush from the road area. The employee also confirmed several Permit violations and issues on FS 223, including the crushed culvert at the intersection of FS 223 and SR 39; ditch lines filled with sediment; and improper grading and winter plowing activities that had caused the loss of stone from the road prism.

136.    Inspections by WV DEP in late October 2023 discovered additional violations, including evidence that the Applicant had allowed non-durable and toxic material to spill on the coal haulroad and, specifically, that trucks had spilled raw coal on to the surface of the haulroad in several locations. A follow-up inspection by WV DEP on November 3, 2023, confirmed that raw coal remained on the haulroad and indicated that sediment sump clearing had begun.

137.    These conditions are indicative of the myriad harmful effects of the activities authorized by the Permit on the environment and on endangered species and critical habitat.

138.    The activities authorized by the Permit result in sedimentation impacting the endangered candy darter and its critical habitat.

139.    Noise disturbance from coal hauling, increased truck traffic, and extensive road work, along with vegetation and tree clearing activities, are also likely to disturb and harm bats.

140.    The surface mining activities at Rocky Run Mine, which would not occur but for the authorization of the Permit, are also likely to have significant harmful impacts on the environment, including on endangered species and their habitats in the Cherry River watershed.

141.    Despite the numerous likely adverse effects to endangered species and candy darter critical habitat from the activities authorized by the Permit, the Forest Service did not consult with FWS under section 7 of the ESA to ensure that its action is not likely to jeopardize listed species or destroy or adversely modify designated critical habitat.

142.    The Forest Service also did not conduct any environmental analysis under NEPA.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of Section 7(a)(2) of the ESA and, in the alternative, the APA

143.    Plaintiffs reallege and incorporate by reference all allegations contained in the preceding paragraphs as though fully set forth below.

144.    Section 7(a)(2) of the ESA requires the Forest Service to consult with FWS to ensure that "any action authorized, funded, or carried out … is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2).

145.    The ESA's implementing regulations require the Forest Service to initiate consultation whenever a proposed action "may affect" listed species, 50 C.F.R. § 402.14(a).

146.    The Forest Service's authorization of the Permit allowing the Applicant to haul coal and coal mining supplies and equipment on Forest Service roads is an agency action within the meaning of the ESA.

147.    The Forest Service's authorization of the Permit may affect—and indeed is likely to adversely affect—ESA-listed species or destroy or adversely modify critical habitat.

148.    The Forest Service violated section 7(a)(2) of the ESA's procedural requirement to initiate and complete consultation before issuing the Permit.

149.    The Forest Service violated section 7(a)(2) of the ESA's substantive requirement to ensure that the Forest Service's authorization of the Permit does not jeopardize listed species or destroy or adversely modify critical habitat.

150.    The Forest Service's failure to initiate and complete consultation before issuing the Permit violates section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), the ESA's implementing regulations, 50 C.F.R. § 402.14, and the APA, 5 U.S.C. § 706(1), (2)(A), (2)(D).

**SECOND CLAIM FOR RELIEF**
**Violation of Section 7(d) of the ESA and, in the alternative, the APA**

151.    Plaintiffs reallege and incorporate by reference all allegations contained in the preceding paragraphs as though fully set forth below.

152.    Section 7(d) of the ESA requires that once an agency initiates section 7(a)(2) consultation, the agency "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2)." 16 U.S.C. § 1536(d). The purpose of section 7(d) is to preserve the status quo and prevent harm to listed species and critical habitat during section 7(a)(2) consultation.

153.    This prohibition "continues until the requirements of section 7(a)(2) are satisfied." 50 C.F.R. § 402.09.

154.    The Forest Service issued the Permit to the Applicant before satisfying section 7(a)(2)'s procedural and substantive requirements.

155.    By issuing the Permit before completing section 7(a)(2) consultation with FWS, which allowed the Applicant to begin activities significantly impacting endangered species and the candy darter's critical habitat, the Forest Service foreclosed itself from formulating or implementing reasonable and prudent alternative measures to avoid jeopardizing listed species and destroying or adversely modifying critical habitat—measures that could have prevented the harmful conditions on the Forest Service roads and their likely effects on endangered and threatened species and critical habitat.

156.    The Forest Service's irretrievable commitment of resources in a manner that foreclosed the formulation or implementation of RPMs or RPAs to protect listed species and critical habitat violates section 7(d) of the ESA, 16 U.S.C. § 1536(d), its implementing regulations, 50 C.F.R. § 402.09, and the APA, 5 U.S.C. § 706.

**THIRD CLAIM FOR RELIEF**
**Violation of NEPA and the APA**

157.    Plaintiffs reallege and incorporate by reference all allegations contained in the preceding paragraphs as though fully set forth below.

158.    NEPA requires federal agencies to take a hard look at the environmental effects of proposed actions. 42 U.S.C. § 4332(2)(C).

159.    NEPA requires federal agencies to consider the effects of each "major [f]ederal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The effects analysis must examine not only the direct impacts of a proposed action, but also the

indirect and cumulative impacts, and impacts of connected actions. 40 C.F.R. §§ 1508.1(g), 1501.3(b), 1501.9(e)(1)(i)–(iii).

160.    The Forest Service's issuance of the Permit is a major federal action within the meaning of NEPA. 40 C.F.R. § 1508.1.

161.    The Forest Service's issuance of the Permit is a final agency action within the meaning of the APA. 5 U.S.C. § 704.

162.    The Forest Service failed to conduct any analysis pursuant to NEPA regarding the significant effects the Forest Service's issuance of the Permit would have on the environment.

163.    The Forest Service's failure to follow procedures required by NEPA, 42 U.S.C. § 4332, constitutes agency action unlawfully withheld or unreasonably delayed, 5 U.S.C. § 706(1), is without observance of procedure required by law, 5 U.S.C. § 706(2)(D), and is, alternatively, arbitrary, capricious, and otherwise not in accordance with law, 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court to enter judgment for Plaintiffs and provide the following relief:

1.  Declare that Defendants are in violation of the ESA, NEPA, and APA as alleged herein;

2.  Vacate and set aside the Forest Service's Permit;

3.  Order the Forest Service to complete consultation with FWS that complies with the ESA;

4.  Order the Forest Service to complete an environmental review that complies with NEPA;

5.  Enjoin the Forest Service from authorizing the use of Forest Service roads on the Monongahela NF until it fully complies with the ESA, NEPA, and the APA;

6. Award Plaintiffs their reasonable attorneys' fees and costs pursuant to the ESA, 16 U.S.C. § 1540(g)(4), Equal Access to Justice Act, 28 U.S.C. § 2412, and Fed. R. Civ. P. 54(d), as applicable; and

7. Grant Plaintiffs such other relief as the Court deems just and proper.

DATED: January 10, 2024

Respectfully submitted,

*/s/ Margaret E. Townsend*
Margaret E. Townsend (D.C. Bar No. OR0008)
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211-0374
(971) 717-6409
mtownsend@biologicaldiversity.org

*/s/ Ryan A. Shannon*
Ryan A. Shannon (D.C. Bar No. OR0007)
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211-0374
(971) 717-6407
rshannon@biologicaldiversity.org

*Counsel for Plaintiffs*