# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### AT BECKLEY

CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,

        *Plaintiffs*,

    v.

UNITED STATES FOREST SERVICE, *et al.*

        *Defendants*,

    v.

SOUTH FORK COAL COMPANY, LLC,

        *Defendant-Intervenor*.

Civil Action No. 5:24-cv-00274
(Chief Judge Volk)

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................................... iii

INTRODUCTION ...................................................................................................................... 1

STATEMENT OF THE ISSUES ............................................................................................... 2

LEGAL FRAMEWORK ........................................................................................................... 2

    I.    Endangered Species Act ................................................................................................. 2

    II.    National Environmental Policy Act ............................................................................... 5

STATEMENT OF THE FACTS ................................................................................................ 6

STANDARD OF REVIEW ....................................................................................................... 12

ARGUMENT .............................................................................................................................. 13

    I.    Plaintiffs have Article III standing. ............................................................................... 13

    II.    The Forest Service violated Section 7(a)(2) of the ESA when it failed to consult with FWS before issuing the RUP. ......................................................................................... 15

    III.    The Forest Service violated NEPA when it failed to conduct an environmental review before issuing the RUP. ................................................................................................... 18

REMEDY ..................................................................................................................................... 19

CONCLUSION ........................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Appalachian Voices v. U.S. Dep't of Interior*,
25 F.4th 259 (4th Cir. 2022) ............................................................. 1, 2, 3, 4, 8, 9

*Colo. Envtl. Coal. v. Office of Legacy Mgmt.*,
819 F. Supp. 2d 1193 (D. Colo. 2011) ....................................................... 4

*Ctr. for Biological Diversity v. EPA*,
861 F.3d 174 (D.C. Cir. 2017) ............................................................. 4, 14

*Ctr. for Biological Diversity v. U.S. Mar. Admin.*,
No. 4:21-cv-00132, 2023 WL 2746028 (E.D. Va. Mar. 31, 2023) ................ 4, 17

*Defs. of Wildlife v. Salazar*,
877 F. Supp. 2d 1271 (M.D. Fla. 2012) ...................................................... 20

*Defs. of Wildlife v. U.S. Dep't of Interior*,
931 F.3d 339 (4th Cir. 2019) .............................................................. 19, 20

*DOT v. Pub. Citizen*,
541 U.S. 752 (2004) ......................................................................... 6

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ...................................................................... 13, 15

*Karuk Tribe of Cal. v. U.S. Forest Serv.*,
681 F.3d 1006 (9th Cir. 2012) .............................................................. 17

*Krichbaum v. U.S. Forest Serv.*,
973 F. Supp. 585 (W.D. Va. 1997), *aff'd* 139 F.3d 890 (4th Cir. 1998) ............ 9

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ...................................................................... 13, 14

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ......................................................................... 13

*N.C. Wildlife Fed'n v. N.C. DOT*,
677 F.3d 596 (4th Cir. 2012) ............................................................... 5

*Nat'l Audubon Soc'y v. Dep't of Navy*,
422 F.3d 174 (4th Cir. 2005) ............................................................... 18

*Nat'l Parks Conservation Ass'n v. Jewell*,
62 F. Supp. 3d 7 (D.D.C. 2014) ......................................................... 4, 16, 20

*Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*,
479 F. Supp. 2d 607 (S.D. W. Va. 2007) ..................................................... 5

*Piedmont Envtl. Council v. U.S. DOT*,
159 F. Supp. 2d 260 (W.D. Va. 2001) ....................................................... 9

*Save the Yaak Comm. v. Block*,
   840 F.2d 714 (9th Cir. 1988) ........................................................ 6

*Shenandoah Valley Network v. Capka*,
   669 F.3d 194 (4th Cir. 2012) ....................................................... 6

*Sierra Club v. U.S. Dep't of Interior*,
   899 F.3d 260 (4th Cir. 2018) ............................................. 12, 13, 15

*Sierra Club v. U.S. Forest Serv.*,
   897 F.3d 582 (4th Cir. 2018) ................................................. 5, 12

*Tenn. Valley Auth. v. Hill*,
   437 U.S. 153 (1978) ............................................................. 1, 2

*Thomas v. Peterson*,
   753 F.2d 754 (9th Cir. 1985) .................................................. 6, 19

*Wash. Toxics Coal. v. EPA*,
   413 F.3d 1024 (9th Cir. 2005) .................................................. 20

*Wilderness Watch v. Mainella*,
   375 F.3d 1085 (11th Cir. 2004) ................................................ 19

**Statutes**

5 U.S.C. § 706 ................................................................ 12, 19

5 U.S.C. § 706(2)(A) ............................................................ 12

5 U.S.C. § 706(2)(D) ............................................................ 12

16 U.S.C. § 1531(b) .............................................................. 2

16 U.S.C. § 1532(5) .............................................................. 3

16 U.S.C. § 1536(a) .............................................................. 5

16 U.S.C. § 1536(a)(2) ..................................................... 1, 4, 15

16 U.S.C. § 1536(c)(1) ........................................................ 3, 4

16 U.S.C. § 1536(d) ........................................................... 5, 20

16 U.S.C. § 1538 ................................................................. 2

30 U.S.C. §§ 1234–1328 ......................................................... 10

42 U.S.C. § 4331(b)(1) ........................................................... 5

42 U.S.C. § 4332(2)(C) ......................................................... 5, 6

42 U.S.C. § 4332(2)(C)(iii) ...................................................... 5

42 U.S.C. § 4336(b)(2) ........................................................... 6

**Regulations**

36 C.F.R. § 220.4(a) ............................................................................ 6

36 C.F.R. § 220.7(3) ............................................................................ 6

50 C.F.R. § 402.02 ........................................................... 3, 15, 17, 18

50 C.F.R. § 402.09 ............................................................................ 5

50 C.F.R. § 402.12 ............................................................................ 3

50 C.F.R. § 402.12(f)(4) .................................................................... 3

50 C.F.R. § 402.13 ............................................................................ 5

50 C.F.R. § 402.14 ............................................................................ 5

50 C.F.R. § 402.14(a) ................................................................ 1, 3, 4

**Federal Register**

83 Fed. Reg. 58747 (Nov. 21, 2018) .............................................. 10

86 Fed. Reg. 17956 (April 7, 2021) ............................................ 9, 16

87 Fed. Reg. 73488 (Nov. 30, 2022) .............................................. 11

**Other Authorities**

Fed. R. Civ. P. 56(a) ....................................................................... 12

U.S. Fish and Wildlife Serv. & Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook: Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act* (1998) .................................................. 4

W. Va. Code § 22-11 ...................................................................... 10

**INTRODUCTION**

Section 7(a)(2) of the Endangered Species Act ("ESA") requires all federal agencies, including the U.S. Forest Service, to "insure that *any* action authorized, funded, or carried out . . . is not likely to jeopardize the continued existence of any endangered species . . . or result in the destruction or adverse modification of" habitat essential to their survival and recovery. 16 U.S.C. § 1536(a)(2) (emphasis added). Compliance with the ESA's substantive mandate is achieved procedurally through "consultation" with the U.S. Fish and Wildlife Service ("FWS"). *Id.* The threshold to trigger consultation is low—it is required if an action by the Forest Service "*may* affect" endangered species or their critical habitat. 50 C.F.R. § 402.14(a) (emphasis added). Congress' plain intent in passing the ESA "was to halt and reverse the trend toward species extinction, whatever the cost." *Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259, 264 (4th Cir. 2022) ("*AppVoices*") (quoting *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978)).

The Forest Service in this case, however, ignored the ESA's mandate when it issued a commercial road use permit ("RUP") allowing a coal company, Defendant-Intervenor South Fork Coal Company ("SF Coal"), to use gravel roads in the Monongahela National Forest ("MNF") to conduct extensive road work and haul oversized coal loads and coal mining supplies and equipment. Specifically, the Forest Service failed to consult with FWS regarding how these heavy industrial activities are likely to impact the endangered candy darter ("Darter")—a colorful fish known as the underwater rainbow—even though the roads are adjacent to streams occupied by the Darter and designated as critical habitat within one of the species' last remaining strongholds, the Cherry River watershed. Endangered northern long-eared bats and Indiana bats also roost and forage along the streams and roads in the MNF impacted by the issuance of the RUP, but the Forest Service also arbitrarily failed to consult with FWS regarding the effects on these species. Its failure to do so violates the ESA's procedural and substantive mandates.

The Forest Service also failed to conduct the environmental review required under the National Environmental Policy Act ("NEPA"), which requires the Forest Service to take a hard look at the environmental impacts of its actions to provide the agency with the information necessary to protect ecologically sensitive areas and wildlife, and allow the public to provide input before the action is final. Because the Forest Service's action violates the ESA, NEPA, and the Administrative Procedure Act ("APA"), the Court should vacate the unlawful RUP.

## STATEMENT OF THE ISSUES

Did the Forest Service: (1) violate Section 7(a)(2) of the ESA by failing to consult with FWS before issuing the RUP authorizing SF Coal to conduct extensive road work and haul oversized coal loads and mining supplies and equipment on Forest Service roads, despite the clear potential for these activities to affect endangered species and their critical habitat; and (2) violate NEPA when it failed to conduct an environmental review before issuing the RUP?

## LEGAL FRAMEWORK

I.    **Endangered Species Act**

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," and it "requires federal agencies 'to afford first priority to the declared national policy of saving endangered [or threatened] species.'" *AppVoices*, 25 F.4th at 264 (quoting *Tenn. Valley Auth.*, 437 U.S. at 180, 185). To that end, the ESA provides "a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and establishes "a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

Once FWS lists a species as endangered or threatened under the ESA, the species receives an array of procedural and substantive protections essential to the species' survival and recovery. *See, e.g.*, *id.* § 1538 (prohibiting "take"—*e.g.*, harm, harassment, wounding, or

killing—of endangered species). For instance, the ESA requires FWS to designate as "critical habitat" the habitat that is "essential to the conservation of the species." *Id.* § 1532(5).

One of the most important protections is provided by Section 7(a)(2), which establishes procedural and substantive requirements for "action agencies," such as the Forest Service. *AppVoices*, 25 F.4th at 264. Procedurally, an action agency must consult with FWS about any "action" that "may affect" a listed species or critical habitat. 50 C.F.R. § 402.14(a). An "action" means "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," including "granting . . . permits," and "actions directly or indirectly causing modifications to the land, water, or air." *Id.* § 402.02.

First, the agency must determine whether ESA-listed or proposed species may be present in the "action area," 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12, which includes "all areas to be affected directly or indirectly by the . . . action and not merely the immediate area," 50 C.F.R. § 402.02. If so, the agency must prepare a biological assessment ("BA") to determine whether the species is "likely to be adversely affected" by the action. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12. The BA must analyze the "effects of the action on the species and habitat" and any "cumulative effects," 50 C.F.R. § 402.12(f)(4), which are the "effects of future State or private activities . . . reasonably certain to occur within the action area," *id.* § 402.02. Importantly, the effects include "all consequences to listed species or critical habitat that are caused by the proposed action," including "the consequences of other activities that are caused by the proposed action," and those that "may occur later in time" or "outside the immediate area involved in the action." *Id.* An action "causes" a consequence if it "would not occur *but for* the proposed action and it is reasonably certain to occur." *Id.* (emphasis added).

Following Section 7(a)(2)'s required consultation procedures is necessary for an agency to fulfill the ESA's substantive mandate to "insure" that any agency action "is not likely to

jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [designated critical] habitat." 16 U.S.C. § 1536(a)(2), (c)(1); *see also AppVoices*, 25 F.4th at 264 (explaining that Section 7(a)(2)'s "substantive duty to avoid jeopardy is policed by a procedural consultation requirement").

The Forest Service must review its actions "at the earliest possible time" to determine whether an action "may affect listed species or critical habitat," 50 C.F.R. § 402.14(a), and the agency "may not duck its consultation requirement," *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 189 n.10 (D.C. Cir. 2017). The agency is relieved of its consultation duty only if it affirmatively determines that an action will have "no effect" on listed species or critical habitat, and if FWS concurs in writing with the action agency's "no effect" determination.[1]

"The threshold to trigger consultation under the ESA is low." *Ctr. for Biological Diversity v. U.S. Mar. Admin.*, No. 4:21-cv-00132, 2023 WL 2746028, at *36 (E.D. Va. Mar. 31, 2023). An action agency, such as the Forest Service, must consult with FWS about "[a]ny possible effect, whether beneficial, benign, adverse, or of an undetermined character." *Nat'l Parks Conservation Ass'n v. Jewell*, 62 F. Supp. 3d 7, 13 (D.D.C. 2014). FWS's ESA Handbook clarifies that this standard is met even by "discountable effects," meaning "those extremely unlikely to occur," and "insignificant effects," meaning those incapable of being "meaningfully measure[d], detect[ed], or evaluate[d]." ESA Handbook at xv–xvi; *see also Colo. Envtl. Coal. v. Office of Legacy Mgmt.*, 819 F. Supp. 2d 1193, 1222 (D. Colo. 2011) (holding that an assertion of "highly unlikely" effects on a species nevertheless met the "may affect" standard, requiring consultation).

---

[1] *See* U.S. Fish and Wildlife Serv. & Nat'l Marine Fisheries Serv., *Endangered Species Consultation Handbook: Procedures for Conducting Consultation and Conference Activities Under Section 7 of the Endangered Species Act* 3–12 (1998) (*hereinafter* "ESA Handbook"), available at https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf.

A federal action that "may affect" listed species or critical habitat may not proceed until the action agency completes consultation. 16 U.S.C. § 1536(a); 50 C.F.R. §§ 402.13, 402.14. Specifically, an agency "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures" necessary to avoid jeopardy to species. 16 U.S.C. § 1536(d). This prohibition "is in force during the consultation process and continues until the requirements of section 7(a)(2) are satisfied." 50 C.F.R. § 402.09.

## II.     National Environmental Policy Act

NEPA declares a national commitment to "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations." 42 U.S.C. § 4331(b)(1). Congress enacted NEPA, "in part, to reduce or eliminate environmental damage." *Sierra Club v. U.S. Forest Serv.*, 897 F.3d 582, 590 (4th Cir. 2018) ("*Sierra Club I*") (cleaned up). NEPA does this by requiring federal agencies to follow procedures that "focus on . . . analyses of the environmental impact of their proposals and actions," *id.*, and on sharing that information with the public, *see N.C. Wildlife Fed'n v. N.C. DOT*, 677 F.3d 596, 601 (4th Cir. 2012).

NEPA requires an agency to "take a 'hard look' at environmental consequences" of its actions and "provide for broad dissemination of relevant environmental information." *Sierra Club I*, 897 F.3d at 590 (cleaned up). This serves to "prevent uninformed agency action," *Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs*, 479 F. Supp. 2d 607, 625 (S.D. W. Va. 2007); *see also* 42 U.S.C. § 4332(2)(C), and "ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct," *N.C. Wildlife Fed'n*, 677 F.3d at 601 (cleaned up). NEPA also requires federal agencies to analyze "a reasonable range of alternatives . . . , including . . . a no action alternative." 42 U.S.C. § 4332(2)(C)(iii).

If an action is likely to "significantly affect[] the quality of the human environment," the agency must prepare "a detailed" environmental impact statement ("EIS"), *DOT v. Pub. Citizen*, 541 U.S. 752, 757 (2004) (quoting 42 U.S.C. § 4332(2)(C)), that "must describe 'any adverse environmental effects which cannot be avoided' and rigorously explore alternatives to the proposed action," *Shenandoah Valley Network v. Capka*, 669 F.3d 194, 196 (4th Cir. 2012) (quoting 42 U.S.C. § 4332(2)(C)). To determine whether an EIS is required because an action's effects are "significant," or if the significance of the effects is unknown, the agency must draft an environmental assessment ("EA"). 42 U.S.C. § 4336(b)(2); 36 C.F.R. § 220.4(a). In an EA, the Forest Service must "provide sufficient evidence and analysis[ of] the environmental impacts of the proposed action and alternative(s)," including the direct, indirect, and cumulative effects. 36 C.F.R. § 220.7(3). For instance, approval of an access road across federal lands requires an analysis of the impacts of the road as well as the activities for which the road is being approved. *See Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir. 1985) ("[T]he timber sales cannot proceed without the road."); *Save the Yaak Comm. v. Block*, 840 F.2d 714, 720 (9th Cir. 1988) ("[R]oad reconstruction, timber harvest, and feeder roads are all 'connected actions' that must be analyzed by the Forest Service in deciding whether to prepare an EIS or only an EA.").

## STATEMENT OF THE FACTS

On June 15, 2021, SF Coal applied for a commercial road use permit to use two gravel Forest Service roads, 249 ("FS249") and 223 ("FS223"), in the MNF. *See* Webb Decl. Ex. 1. Specifically, SF Coal sought to use FS249 to haul oversized coal loads from the Rocky Run Surface Coal Mine ("Rocky Run Mine") to a preparation plant in Clearco, West Virginia, and to use FS223 to haul mining equipment and supplies—including fuels and explosives—to and from Rocky Run Mine. *Id.*; AR25. SF Coal planned to begin coal hauling on FS249 immediately upon

receipt of the RUP, AR152, and in mid-August 2021, informed the Forest Service that it was "in need to and prepared to begin immediately upon [the Forest Service's] authorization," AR107.

The Forest Service issued the RUP on September 29, 2021, AR135, effective until September 1, 2031, AR128. The RUP authorized SF Coal to haul oversized coal loads daily (36,000 tons per month) and conduct extensive road reconstruction work on FS249, including: installing, lengthening, and replacing drainpipes and culverts; grading and resurfacing the road by compacting crushed aggregate into the roadway; scarifying the road; constructing sumps; clearing drainage ditches; placing riprap[2] into receiving streams; and clearing vegetation and brush from the road prism, including by removing trees larger than 5 inches in diameter at breast height between November 15 and March 31. AR92, AR132, AR139–140, AR151–152. The RUP also authorized SF Coal to haul mining supplies and equipment on FS223, AR137, and required SF Coal to perform regular maintenance on FS249 and FS223, including: "removing bank slough, minor slides, and fallen timber, replacing material washed out of fill slopes, and cleaning out drainage ditches and culverts," AR142; and "cleaning culverts" to remove "silt, slough, and debris with hand tools," AR143.

The Forest Service closed FS249 to public access for the RUP's 10-year duration and described its issuance of the RUP for FS249 as "more complicated because it will be shut down and [SF Coal] will be doing extensive rebuild and heavy maintenance for the expected loads." Webb Decl. Ex. 2 at 2. The Forest Service also considered "the type of heavy use and potential for spill/contamination" when assessing a bond for FS249. *Id.*

---

[2] Riprap is a "foundation" or "layer" of "stones or chunks of concrete" installed in waters or embankments typically to prevent erosion. *See* Merriam Webster, https://www.merriam-webster.com/dictionary/riprap.



*Map - from Bradley Decl. Ex. 1*

FS249 runs steeply upslope of South Fork Cherry River and as close as 925 feet away, and the road follows the river off the MNF, where it becomes Sugartree Road and crosses the headwaters of Laurel Creek on its way to the preparation plant in Clearco. *See Map above*; Bradley Decl. Exs. 1, 2, 3; *see also* AR16, AR17. Rocky Run Mine drains into tributaries that flow from steep slopes into the South Fork Cherry River. *See Map above*. FS223 generally travels north-south along Bear Run, a direct tributary to North Fork Cherry River. *See Map above*; *see also* AR17.

These waterbodies are important habitat of the endangered Darter, which is a "habitat specialist" that is "typically found in high-to moderate-gradient, cool-or cold-water stream ecosystems." AR174; *see also AppVoices*, 25 F.4th at 267–68. The Darter's designated critical

habitat includes South Fork Cherry River, North Fork Cherry River, and Laurel Creek, *see* Designation of Critical Habitat for Candy Darter, 86 Fed. Reg. 17956, 17966 (April 7, 2021),[3] and Darters are well distributed throughout these streams within the Cherry River watershed.[4]

The Darter is "intolerant of excessive stream sedimentation," AR174, which refers to "the degree to which gravel, cobble, rocks, and boulders are surrounded by, or covered with, fine sediment particles." Darter SSA 1. FWS has determined that "[e]xcessive stream sedimentation . . . results from soil erosion associated with upland activities (e.g., . . . forestry, mining, unpaved roads, [and] road . . . construction . . .) as well as activities that can destabilize stream channels themselves (e.g. . . . culverts . . . or other instream structures)." *Id.* at 38. Darters are not highly mobile, meaning they "will likely not avoid areas of heavy sediment deposition by moving to other areas of suitable habitat within the system." *AppVoices*, 25 F.4th at 268. Of the 18 remaining, highly fragmented Darter populations, many are threatened by excessive sedimentation in their stream habitat. *See* Endangered Species Status for the Candy Darter, 83

---

[3] While judicial review of agency action is typically limited to the record that was before the agency at the time the decision was made,

> courts have allowed the record to be supplemented with outside documents (1) if it appears that the agency relied on documents not in the record, (2) to illustrate factors that the agency should have considered but did not, (3) to provide background information helpful to an understanding of unclear or technical portions of the record, or (4) if the plaintiff alleges bad faith and provides a reasonable basis in fact for such contention.

*Piedmont Envtl. Council v. U.S. DOT*, 159 F. Supp. 2d 260, 270 (W.D. Va. 2001). This court has further recognized that "these exceptions are 'particularly important when reviewing a decision under NEPA where a court must determine whether the agency considered all relevant factors.'" *Id.* (citing *Krichbaum v. U.S. Forest Serv.*, 973 F. Supp. 585, 589 (W.D. Va. 1997), *aff'd* 139 F.3d 890 (4th Cir. 1998)).

[4] *See* U.S. Fish and Wildlife Serv., *Species Status Assessment (SSA) Report for the Candy Darter* (Etheostoma osburni) 46 (Mar. 2018), available at https://ecos.fws.gov/ServCat/DownloadFile/161132 (*hereinafter* "Darter SSA").

Fed. Reg. 58747, 58751 (Nov. 21, 2018) ("Excessive sedimentation . . . [has] degraded [the Darter's] once-suitable habitat . . . and likely caused historical declines of the [Darter].").

FWS has further determined that existing regulatory mechanisms—including the Surface Mining Control and Reclamation Act (SMCRA), 30 U.S.C. §§ 1234–1328; West Virginia Water Pollution Control Act, W. Va. Code § 22-11; and the "increased implementation of forestry and construction 'best management practices' designed to reduce erosion and sedimentation," 83 Fed. Reg. at 58751—were "not sufficient to protect the [Darter] from extinction as excessive sedimentation and increased water temperatures continue to affect some of the remaining populations" and because "[t]here may be additional infrastructure projects (*e.g.,* roads . . .) that increase sediment loading within the range of the [Darter] as a result of stream crossings or forest clearing for permanent rights of way." *Id.* As a result, FWS determined that sedimentation continues to affect the Darter across its range. *Id.*

The Forest Service roads impacted by the RUP, as well as the Rocky Run Mine site itself, also offer foraging and roosting habitat for two endangered bats: the Indiana bat and the northern long-eared bat ("NLEB").[5] Both bats depend on intact forest habitat, unfragmented by roads or large clearings, and typically roost and forage in mixed-conifer forests near rivers and around stream corridors.[6] Both bats face a risk of extinction from the threat of habitat loss, including loss

---

[5] *See* SF Coal Co., *Indiana Bat Protection and Enhancement Plan for the Rocky Run Surface Mine* 4 (Sept. 2019), Young Decl. Ex. 30 (*hereinafter* "Bat PEP") (The "proposed area for the [Rocky Run Mine] and habitat in and around the area of the proposed [Rocky Run Mine] has been deemed suitable to the Indiana Bats and the [NLEB].").

[6] *See* U.S. Fish and Wildlife Service, *Range-Wide Indiana Bat Protection and Enhancement Plan Guidelines* 10 (2009) ("Indiana bats often forage along streams and wetlands") available at https://www.fws.gov/sites/default/files/documents/Range-Wide-Indiana-Bat-Protection-and-Enhancement-Guidelines.pdf (*hereinafter* "Indiana Bat PEP Guidelines"); Endangered Species Status for Northern Long-Eared Bat, 87 Fed. Reg. 73488, 73492 (Nov. 30, 2022) (stating that outside of hibernation, NLEBs "predominantly are found in forest habitat . . . , but when foraging they have also been observed . . . over small forest clearings and water and along roads."); *see also* U.S. Fish and Wildlife Service, *Species Status Assessment Report for the Northern Long-*

of roosting and foraging habitat.[7] FWS has stated that "[c]oal mining operations may affect the Indiana bat . . . when forested habitat which could serve as foraging, roosting, or travel corridor habitat is cleared to facilitate the mining activity," Indiana Bat PEP Guidelines at 2, and that "[f]ederal agency actions within [NLEB's] habitat that may require consultation include, but are not limited to, management and any other landscape-altering activities on Federal lands administered by . . . the U.S. Forest Service." 87 Fed. Reg. at 73502.

The RUP authorized activities that may affect these endangered species. Daily hauling of oversized coal loads and heavy mining equipment damages gravel roads and, together with the road work required under the RUP, may increase sedimentation into South Fork Cherry River, North Fork Cherry River, and Laurel Creek, damaging the Darter's occupied critical habitat. *See* Darter SSA 38. Coal dust escapes open-top coal trucks driving on unpaved roads, fugitive dust arises from heavy use of unpaved roads, and coal truck accidents can spill large amounts of coal, polluting the surrounding air and water, threatening stream ecosystems and aquatic life, and contaminating drinking water sources.[8] The road work, tree cutting, vegetation clearing, and heavy truck traffic authorized under the RUP and any resulting dust, noise, and spills from coal

_____

*Eared Bat* (*Myotis septentrionalis*) 18–19 (*hereinafter* "NLEB SSA") available at https://www.fws.gov/media/species-status-assessment-report-northern-long-eared-bat ("NLEB seem to prefer intact mixed-type forests with small gaps (i.e., forest trails, small roads, or forest-covered creeks) in forest with sparse or medium vegetation for forage and travel rather than fragmented habitat or areas that have been clear cut.").

[7] *See* NLEB SSA 42 ("Impacts from forest habitat removal may range from minor (e.g., removal of a small portion of foraging habitat in unfragmented forested area with a robust NLEB population) to significant (e.g., removal of roosting habitat in highly fragmented landscape with small, disconnected population)."); Indiana Bat PEP Guidelines at 10 ("The removal of a stream, wetland, and/or associated edges/banks may harm bats by removing their foraging area . . . .").

[8] *See* W.R. Reed & J.A. Organiscak, *Haul Road Dust Control – Fugitive Dust Characteristic From Surface Mine Haul Roads and Methods of Control* (2007), Centers for Disease Control & Prevention, available at https://stacks.cdc.gov/view/cdc/8897; Viney P. Aneja *et al.*, *Characterization of Particulate Matter (PM$_{10}$) Related to Surface Coal Mining Operations in Appalachia*, 54 Atmos. Envt. 496–501, available at https://www.sciencedirect.com/science/article/abs/pii/S1352231012001781.

trucks may affect and disturb roosting bats and disrupt bat foraging in the surrounding mixed conifer-red spruce forest.[9] Further, FWS affirmed that the Rocky Run Mine "may affect" the Darter and both bats. AR174.

Despite the fact that the RUP authorized activities that may affect endangered species and their critical habitat, the Forest Service did not consult with FWS under Section 7(a)(2) of the ESA before it issued the RUP and did not conduct any environmental analysis under NEPA.

## STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The APA provides the standard of review for the Forest Service's failure to initiate and complete ESA Section 7 consultation and NEPA review prior to issuance of the RUP. 5 U.S.C. § 706; *see Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 270 (4th Cir. 2018) ("*Sierra Club II*") (regarding the ESA); *Sierra Club I*, 897 F.3d at 590 (regarding NEPA). Under the APA, an agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "without observance of procedure required by law," *id.* § 706(2)(D). An agency action is arbitrary and capricious if the agency

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

---

[9] *See* Indiana Bat PEP 5; *see also* U.S. DOT, *Range-Wide Biological Assessment for Transportation Projects for Indiana Bat and Northern Long-Eared Bat*, available at https://www.environment.fhwa.dot.gov/ESAWebTool/Site/ibatNLEBBA.aspx?AspxAutoDetect CookieSupport=1 ("Transportation projects may directly impact roosting, foraging, or swarming bats or alter their habitat through changes to baseline noise, forest, lighting, air quality, and water quality conditions.").

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The reviewing court "must conduct a 'searching and careful' review to determine whether the agency's decision 'was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Sierra Club II*, 899 F.3d at 270 (internal citations omitted).

## ARGUMENT

### I.     Plaintiffs have Article III standing.

To satisfy Article III standing, a plaintiff must show that "(1) it has suffered an 'injury in fact' . . . ; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely . . . that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). An organization may sue on its members' behalf "when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.*

"[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Id.* at 183 (quotation omitted); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562–63 (1992) ("[T]he desire to . . . observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for the purpose of standing."). Environmental plaintiffs establish causation when they "show that the challenged action is 'in part responsible for frustrating' their ability to enjoy the area,'" and redressability when "granting the requested relief would at least mitigate, if not eliminate, the alleged harm." *Sierra Club II*, 899 F.3d at 283, 285 (cleaned up) (finding plaintiffs demonstrated standing when they established their members' history of enjoying the affected area, that the action would lessen the aesthetic and scenic values of the area and prevent the members from enjoying its full beauty,

and that their injuries were redressable "because granting the requested relief would at least mitigate, if not eliminate, the alleged harm"). When a plaintiff "has been accorded a procedural right to protect [their] concrete interests[,]" they "can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7. The failure to consult is an "archetypal procedural injury." *Ctr. for Biological Diversity v. EPA*, 861 F.3d at 182.

As the attached declarations demonstrate, Plaintiffs' members' professional, scientific, aesthetic, recreational, and other interests are harmed by the Forest Service's failure to comply with the ESA and NEPA when it issued the RUP. *See generally* Curry Decl.; Callahan Decl.; Dodson Decl.; Kotcon Decl.; Webb Decl.; Wood Decl.; Young Decl. For example, Center for Biological Diversity member Tierra Curry has been working on Darter conservation since 2010 and has visited the area impacted by the RUP while looking for Darters on numerous occasions, with specific plans to visit again in May 2025 to look for Darters in the North and South Fork Cherry River near FS223 and FS249. Curry Decl. ¶¶ 4, 15–17. The Forest Service's issuance of the RUP, without following the procedures required by the ESA and NEPA, harms Ms. Curry's ability to view the Darter in the future because these failures mean that "there are no measures in place to protect the [D]arter from" the activities authorized by the RUP, such as "mining and hauling coal and supplies" which will "continue to cause runoff that will enter the North Fork and South Fork Cherry Rivers." *Id.* ¶¶ 18, 20. In another example, West Virginia Highlands Conservancy member Andrew Young has worked on Darter conservation since 2018 and has visited the area impacted by the RUP on numerous occasions to photograph the streams and forests, with specific plans to visit again in March and May 2025. Young Decl. ¶¶ 6, 12–21, 26. The RUP harms Mr. Young because the "dust, sediment, and runoff" on FS249 is an "imminent threat to the [D]arter's critical habitat in the South Fork Cherry River and Laurel Creek," and "as fugitive dust blankets the vegetation along [FS249 and FS223]" the "tree cutting and the dust and

noise from coal hauling and mining is harming . . . the endangered Indiana bat and [NLEB]." *Id.* ¶¶ 28, 29, 44, 65. The Forest Service's issuance of the RUP, without following the procedures required by the ESA and NEPA, harms his ability to view these species in the future because "[o]nly if the [] Forest Service follows the law do these endangered species get the protection to which they are legally entitled." *Id.* ¶¶ 62–65, 68, 71.

Plaintiffs' members' injuries are caused by the Forest Service's failures to consult under the ESA and conduct the required environmental analysis under NEPA because the lack of these required procedures, and the protections they may have brought, "frustrat[e] their ability to enjoy the area," and an order from the Court vacating the RUP for violating the ESA and NEPA "would at least mitigate, if not eliminate, the alleged harm." *Sierra Club II*, 899 F.3d at 283, 285 (cleaned up). Because Plaintiffs' members have clearly alleged Article III standing, and because "the interests at stake are germane to the organization's purpose" of environmental conservation, "and neither the claim asserted not the relief requested requires the participation of individual members in the lawsuit," *Friends of the Earth*, 528 U.S. at 180–81, Plaintiffs have standing to bring this suit.

## II. The Forest Service violated Section 7(a)(2) of the ESA when it failed to consult with FWS before issuing the RUP.

The Forest Service unlawfully failed to complete or even initiate consultation with FWS before it issued the RUP and authorized activities that may affect endangered species and critical habitat, in violation of Section 7(a)(2) of the ESA. 16 U.S.C. § 1536(a)(2). As an initial matter, the Forest Service's issuance of the RUP falls within the broad scope of agency actions governed by ESA Section 7(a)(2), which include "activities . . . authorized" by the Forest Service. *See* 50 C.F.R. § 402.02. Agency actions include granting permits and actions directly or indirectly causing modifications to the land, water, or air. *Id.* Thus, the Forest Service can avoid

consultation for the RUP "only if it determines that its action will have 'no effect' on threatened or endangered species or critical habitat." *Nat'l Parks Conservation Ass'n*, 62 F. Supp. 3d at 12. Here, the record is devoid of any such "no effect" determination.

In contrast, the record contains ample evidence showing that the activities authorized by the RUP easily meet the extremely low "may affect" threshold to trigger consultation. For instance, the endangered Darter is specifically harmed by disturbance that increases sedimentation in its habitat. FWS has found that "[e]xcessive stream sedimentation (or siltation) results from soil erosion associated with upland activities[,]" such as "mining [and] unpaved roads." Darter SSA 38. This led FWS to conclude that special management considerations may be required to reduce the threat of "excessive sedimentation," 86 Fed. Reg. at 17962, and FWS has determined that "sedimentation remains a problem in many streams within the range of the candy darter." Darter SSA 39.

And the streams occupied by the Darter and its critical habitat receive drainage and sedimentation—or at least *may*, the applicable standard—from the roads at issue in the RUP: South Fork Cherry River receives drainage off FS249, AR16 (map showing FS249 is as close as 925 feet upslope and drains into occupied Darter critical habitat in South Fork Cherry River), AR92 ("Erosion control will be . . . placed in the ditch lines and . . . sumps constructed prior to inlet side on the drain pipes, the outlet side will have rip rap protection in the receiving streams"); and North Fork Cherry River receives drainage off FS223 by way of Bear Run, *see Map supra* 8; Bradley Decl. Exs. 1, 2, 3; *see also* AR16, AR17. Sedimentation into occupied Darter streams resulting from oversized coal hauling and extensive road reconstruction— including installing culverts and placing riprap in streams—and from fugitive dust, spills, and accidents, all certainly "may affect" the Darter and its fragile habitat. *See* Darter SSA 38 (explaining that sedimentation results from mining, unpaved roads, road construction, and

16

activities "that can destabilize stream channels themselves" such as "culverts" and "other instream structures"); *Ctr. for Biological Diversity v. U.S. Mar. Admin.*, 2023 WL 2746028, at *36–37 (information contained in species' critical habitat review and status review demonstrates that project meets low "may affect" threshold). Indeed, the Forest Service recognized the "possibility for spill/contamination" resulting from its issuance of the RUP, *see* Webb Decl. Ex. 2 at 2—actions that also may affect the Darter and increase sedimentation in its habitat.[10] The road work, tree cutting, vegetation clearing, and heavy truck traffic authorized under the RUP, and the resulting dust, noise, and spills from coal trucks on roads in the Cherry River watershed's mixed conifer-red spruce forest, also may affect roosting bats and disrupt bat foraging. *See* Young Decl. ¶ 29; Wood Decl. ¶ 5; *see also supra* 10–11 (discussing impacts to the bats' habitat).

The effects the Forest Service should have considered when issuing the RUP also encompass the "consequences of other activities that are caused by the proposed action," which "would not occur but for the proposed action and [are] reasonably certain to occur." 50 C.F.R. § 402.02. This means that the Forest Service was required to consider the effects of the Rocky Run Mine and the entire haulage path to the preparation plant in Clearco, WV. Indeed, SF Coal has admitted that if FS249 were "unavailable for use by South Fork, it would be forced to cease operations at the Rocky Run Mine," Decl. in Supp. of Mot. to Int. by South Fork Coal Company, LLC ("South Fork Decl.") ¶ 2-d, ECF 10-1, proving that the Rocky Run Mine "would not occur

---

[10] The Forest Service's inclusion in the RUP of measures designed to mitigate sedimentation into Darter streams further demonstrates that it needed to consult. *See Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1028 (9th Cir. 2012) (holding that "an attempt to reduce a possible adverse impact on coho salmon and their habitat suggests exactly the opposite [that the 'may affect' standard was met]"). In *Karuk Tribe*, the Ninth Circuit held that the Forest Service failed to consult before approving a mining company's plan to dredge upstream of coho salmon critical habitat, which included criteria designed to mitigate sedimentation in coho habitat. *Id.* at 1028. Here, the Forest Service similarly attempted to reduce sedimentation impacts from use of FS249 on the Darter's critical habitat, thereby further demonstrating the need to consult with FWS.

but for" the Forest Service's issuance of the RUP, 50 C.F.R. § 402.02, and that the Forest Service was required to consider the Rocky Run Mine's effects when issuing the RUP. Further, when consulting over the effects of the Rocky Run Mine, FWS determined that the mine "may affect" the Darter, Indiana bat, and NLEB. AR174. And on the way to Clearco, the haulroad crosses tributaries of South Fork Cherry River and the headwaters of Laurel Creek, which is occupied critical habitat for the Darter. *See Map supra* 8; Bradley Decl. Exs. 1, 2, 3; *see also* AR16, AR17.

In issuing the RUP, however, the Forest Service completely ignored the likely effects to the Darter and its occupied critical habitat in the Cherry River watershed, and to the Indiana bat and NLEB that roost and forage in the surrounding forest along roads and streams, flouting its consultation obligations and violating Section 7(a)(2) of the ESA.

### III. The Forest Service violated NEPA when it failed to conduct an environmental review before issuing the RUP.

The record contains no evidence that the Forest Service conducted an environmental review that would satisfy NEPA. A court examining the sufficiency of an agency's environmental analysis under NEPA must determine whether the agency has taken a "hard look" at an action's environmental impacts. *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 185 (4th Cir. 2005). This "encompasses a thorough investigation into the environmental impacts of an agency's action and a candid acknowledgment of the risks that those impacts entail." *Id.* Specifically, the Forest Service was required to assess: the effects of road work and oversized coal hauling on FS249; hauling mining equipment, supplies, and explosives on FS223; sedimentation and erosion into South Fork Cherry River, North Fork Cherry River, and Laurel Creek; the possibility of spill and contamination by oversized coal trucks and trucks carrying waste, fuel, and explosives; the 10-year closure of FS249 for the duration of the RUP; and the connected effects of the Rocky Run Mine itself and the rest of the haulroad after it leaves Forest Service lands,

which are interrelated and interdependent with the Forest Service's action to authorize the RUP. *See Thomas*, 753 F.2d at 761 (holding that "before deciding whether to approve the proposed road, the Forest Service is required to prepare and consider . . . the combined impacts of the road and the timber sales that the road is designed to facilitate"); *see* South Fork Decl. ¶ 2-d.

Here, the record is devoid of any analysis that would satisfy NEPA's "hard look" requirement, and the agency did not issue either an EA or an EIS. When the record contains no evidence that the agency "engaged in significant environmental analysis prior to the decision," then allowing the decision to stand "would significantly undermine the statutory scheme." *Wilderness Watch v. Mainella*, 375 F.3d 1085, 1096 (11th Cir. 2004). Such an analysis would have given the Forest Service and Plaintiffs information regarding the significant environmental impacts of the Forest Service's action and an opportunity for public participation in its decision. *See* Young Decl. ¶ 71. Accordingly, the Forest Service violated NEPA when it issued the RUP without completing the required NEPA review.

## REMEDY

The Forest Service violated the ESA and NEPA by failing to complete consultation and conduct an environmental review before issuing the RUP. Therefore, Plaintiffs respectfully request that the Court remedy these violations by vacating the RUP due to the Forest Service's violations of the ESA, NEPA, and APA.

Vacatur is the ordinary remedy for unlawful agency action under the APA. 5 U.S.C. § 706 ("[A] reviewing court *shall* . . . hold unlawful and *set aside* agency action . . . found to be . . . not in accordance with law.") (emphasis added); *see also Defs. of Wildlife v. U.S. Dep't of Interior*, 931 F.3d 339, 345 (4th Cir. 2019) (explaining that the court "will vacate agency action if it is not based on a consideration of the relevant factors or where there has been a clear error of judgment") (cleaned up). Courts regularly vacate agency actions that violate the ESA and NEPA.

*See, e.g.*, *Defs. of Wildlife v. Salazar*, 877 F. Supp. 2d 1271, 1309 (M.D. Fla. 2012) (vacating an agency's offroad vehicle trail designations that violated NEPA and ESA); *Nat'l Parks Conservation Ass'n*, 62 F. Supp. 3d at 18, 22 (vacating an Office of Surface Mining Reclamation and Enforcement rule where the agency failed to complete ESA consultation regarding the rule's effects on species).

Here, the Forest Service failed to follow required procedures under the ESA and NEPA when issuing the RUP. As a result, the Forest Service completely avoided its substantive duty under Section 7(a)(2) of the ESA to ensure against jeopardy to listed species and destruction and adverse modification of critical habitat.[11] These procedural and substantive violations incurably tainted the agency's decision to issue the RUP. Thus, because the Forest Service's unlawful issuance of the RUP was "not 'based on a consideration of the relevant factors'" and demonstrates "'a clear error of judgment,'" *Defs. of Wildlife v. U.S. Dep't of Interior*, 931 F.3d at 345, Plaintiffs request, and the law requires, that the RUP be vacated, unless and until the Forest Service complies with the ESA and NEPA.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be granted, and this Court should vacate the RUP for violations of the ESA, NEPA, and APA.

---

[11] Should the Court agree with Plaintiffs that the RUP is unlawful under Section 7(a)(2) of the ESA and vacate the RUP on that basis, Plaintiffs respectfully request the Court to require that the activities authorized under the RUP cease, pursuant to Section 7(d) of the ESA, 16 U.S.C. § 1536(d) ("after initiation of [section 7(a)(2)] consultation . . . the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources . . . which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures"), in order to preserve the status quo until consultation is completed, *see Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1034–35 (9th Cir. 2005) ("Section 7(d) was enacted to ensure that the status quo would be maintained during the consultation process, to prevent agencies from sinking resources into a project in order to ensure its completion regardless of its impacts on endangered species.").

DATED: November 26, 2024                Respectfully submitted,

*/s/ Margaret E. Townsend*
Margaret E. Townsend
Visiting Attorney
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211-0374
(971) 717-6409
mtownsend@biologicaldiversity.org

Ryan Adair Shannon
Visiting Attorney
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211-0374
(971) 717-6407
rshannon@biologicaldiversity.org

Lindsay E. Reeves
Visiting Attorney
Center for Biological Diversity
3436 Magazine Street, FRNT PMB 539
New Orleans, LA 70115
(504) 342-4337
lreeves@biologicaldiversity.org

*/s/ Benjamin A Luckett*
Benjamin A Luckett (WVSB No. 11463)
Amanda Demmerle (WVSB No. 13930)
APPALACHIAN MOUNTAIN ADVOCATES
P.O. Box 507
Lewisburg, WV 24901
(304) 873-6080
bluckett@appalmad.org
(757) 650-2774
ademmerle@appalmad.org

*Counsel for Plaintiffs Center for Biological
Diversity, Appalachian Voices, Greenbrier River
Watershed Association, Kanawha Forest Coalition,
Sierra Club, and West Virginia Highlands
Conservancy*